UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
   THE UNITED STATES OF AMERICA,

         -against-                                 **MEMORANDUM & ORDER**

   SHA KEN MILLER,                               **18-CR-395 (NGG)**

                      Defendant.
------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Defendant Sha Ken Miller moves to suppress evidence that was seized from a black Kia Sportage (the "Kia"), arguing that police officers twice searched the car in violation of his Fourth Amendment rights and that, at a minimum, the court should hold an evidentiary hearing. (See Def. Mot. to Suppress ("Mot.") (Dkt. 22); Def. Suppl. Letter in Supp. of Mot. ("Suppl. Letter") (Dkt. 30).) For the following reasons, Defendant's motion to suppress is DENIED.

**I.    BACKGROUND**

      On July 11, 2018, two New York Police Department ("NYPD") officers saw Defendant near 80 Monument Walk in Brooklyn, NY (the "Building"). (Compl. (Dkt. 1) ¶ 2.) The officers were in plainclothes and an unmarked police vehicle. (Id.) At the time, Defendant was the subject of an NYPD investigation card (the "I-card"). (Id.). The I-card notified NYPD officers that Defendant was a suspect in connection with another crime, but did not indicate that there was probable cause to arrest him. (Id.) When the officers first saw him, they noticed that Defendant matched the description of the individual from the I-card. (Id.) Defendant was standing outside of the Kia, which was idling near the entrance to the Building. (Id.)

      The Kia belonged to Eddie Wanamaker, although Sierra Wanamaker is "the primary driver and user of the [Kia], with [Mr. Wanamaker's] permission." (Feb. 26, 2019 Decl. of

1

Eddie Wanamaker (Dkt. 26-1) ¶¶ 2-3.) Mr. Wanamaker allows Ms. Wanamaker to loan the Kia to others "if necessary" (id. ¶ 5; see also Feb. 26, 2019 Suppl. Decl. of Sierra Wanamaker ("Sierra Wanamaker Suppl. Decl.") (Dkt. 26-2) ¶ 2), and Ms. Wanamaker had loaned the Kia to Defendant on several other occasions earlier that year. (Sierra Wanamaker Suppl. Decl. ¶ 3.) He was using the Kia with her permission when the officers saw him with it on July 11, 2018. (Id. ¶ 4; Feb. 28, 2019 Sha Ken Miller Decl. ("Miller Decl.") (Dkt. 27-1) ¶¶ 1-2.)

The Government alleges that the officer driving the patrol car, Officer Ramos, drove the car around the block. (Compl. ¶ 3.) As the patrol car approached the entrance to the Building, Officer Ramos and the officer sitting in the front passenger seat ("Officer Two") saw Defendant sitting in the driver's seat of the Kia and talking to a man (the "Unidentified Man") through the front passenger window. (Id.) The Kia was still idling, and the officer observed the Unidentified Man reach into the Kia and touch hands with Defendant. (Id.) He then walked away with a closed fist. (Id.) "Based on their training and experience, the officers believed that [Defendant] and the Unidentified Man had engaged in a hand-to-hand narcotics transaction." (Id.)

Officer Ramos drove the patrol car around the block again, and pulled up behind the Kia, which was still idling. (Id. ¶ 4.) Defendant was still seated in the passenger seat. (Id.) Officer Ramos approached the driver's side window and, according to the Government, smelled a strong odor of marijuana coming from the Kia. (Id.) He asked Defendant to get out of the car and searched the Kia. (Id.) He found marijuana inside a backpack that was on the floor of the Kia's backseat, behind the central console. (Id.) The officers arrested Defendant, and transported him back to the 88th Precinct stationhouse for arrest processing. (Id. ¶ 5.) Officer Two drove the Kia back to the stationhouse to be inventoried. (Id.) Much of the interaction between Defendant and the officers is documented by a camera worn by one of the officers on the scene. (See Video File

No. SM000254, filed in hard copy as Ex. B to Mot. ("SM000254"); Video File No. SM000251, filed in hard copy as Ex. B to Opp'n ("SM000251").).

Officer Ramos then conducted an inventory search of the Kia. (Id. ¶ 6.) During the search, he noticed that the fuse box compartment under the Kia's steering wheel was loose. (Id.) He opened the compartment, finding a .25 caliber Beretta semiautomatic pistol concealed inside the fuse box. (Id.) The gun was loaded with eight rounds of ammunition in the magazine and one in the chamber. (Id.) Much of this inventory search was also documented by a camera worn by one of the officers on the scene. (See Video File No. SM000253, filed in hard copy as Ex. C to Mot. ("SM000253")).

On July 17, 2018, Magistrate Judge Cheryl L. Pollak issued an arrest warrant for Defendant based upon an affidavit and complaint. (See Compl.) Defendant was arrested on July 20, 2018. (Opp'n at 8.) On July 31, 2018, a grand jury issued a three-count indictment charging Defendant with: (1) distribution of and possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841; (2) possessing a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (3) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). (Indictment (Dkt. 9).) Defendant moved to suppress the marijuana and the gun on January 18, 2019 (Mot.), and the court heard oral argument on the motion on February 20, 2019 (Feb. 20, 2019 Min. Entry). Both parties then filed supplemental briefing, and the motion was fully briefed on March 6, 2019. (See Suppl. Letter; Gov't Resp. in Opp'n to Mot. to Suppress ("Suppl. Opp'n") (Dkt. 29).)

II. **LEGAL STANDARD**

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. Const. amend. IV. Generally, evidence that is seized pursuant to an unreasonable search or

derived from such a search must be suppressed. James v. Illinois, 493 U.S. 307, 311-12 (1990). "[S]earches and seizures conducted without a warrant are presumptively unreasonable"; however, "several exceptions to the warrant requirement have been fashioned when circumstances demand an immediate police response." United States v. McCargo, 464 F.3d 192, 196 (2d Cir. 2006) (internal citations omitted).

"A defendant moving for the suppression of evidence seized following a search is not automatically entitled to an evidentiary hearing." United States v. Garcia, No. 18-CR-178 (AT), 2018 WL 3407707, at *2 (S.D.N.Y. June 5, 2018) (quoting United States v. Barrios, 210 F.3d 355, at *1 (2d Cir. 2000) (summary order)). Instead, an evidentiary hearing on a motion for the suppression of evidence is appropriate where a defendant "supports his motion with moving papers that are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." Barrios, 210 F.3d at *1 (alteration adopted) (citation and quotation marks omitted). In other words, a defendant is entitled to an evidentiary hearing where there is "a contested issue of material fact." United States v. Harun, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017) (citation omitted). Arguments made solely by defense counsel in motion papers "cannot by themselves create a factual issue." United States v. Mottley, 130 F. App'x 508, 510 (2d Cir. 2005) (summary order); see also United States v. Spencer, No. 06-CR-413 (DLI), 2016 WL 6781225, at *5 (E.D.N.Y. Nov. 15, 2016) ("[A] statement in an attorney's brief is insufficient to create a factual dispute to justify a hearing." (citations omitted)). Courts in this circuit "have 'repeatedly' denied motions to suppress without a hearing 'where defendants have failed to provide affidavits alleging facts based on personal knowledge.'" United States v. Perryman, No. 12-CR-0123

(ADS), 2013 WL 4039374, at *6 (E.D.N.Y. Aug. 7, 2013) (quoting United States v. Larranga Lopez, No. 05-CR-655 (SLT), 2006 WL 1307963, at *3 (E.D.N.Y. May 11, 2006)).

## III. DISCUSSION

Defendant seeks to suppress evidence discovered during two warrantless searches of the Kia.[1] First, Defendant challenges the initial search of the Kia, which uncovered the marijuana. (See Mot. at 3-4.) Second, Defendant challenges the inventory search of the Kia performed at the precinct, which uncovered the firearm. (See id. at 4-6.) The court addresses each in turn.

### A. The Initial Search of the Kia

First, Defendant claims that the initial search of the Kia was unreasonable, and asks the court to suppress both the marijuana and the firearm as fruits of that unreasonable search. (See Mot. at 3-4.) There was no warrant for the search, but the Government argues that the "automobile exception" applies here and justifies the search. (See Opp'n at 17.) Pursuant to the automobile exception, the police may search a car—or containers inside a car—"without a warrant if their search is supported by probable cause." California v. Acevedo, 500 U.S. 565, 579 (1991). Defendant contends, however, that this exception does not justify the search because the officers did not have probable cause to suspect that a crime had been or was currently being committed. (See Mot. at 3.)

"[P]robable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." United States v. Gaskin, 364 F.3d 438, 456 (2d Cir. 2004)

---

[1] Defendant does not contest whether the officers had reasonable suspicion to stop him and the Kia. (See Opp'n at 16.) The parties also agree that Defendant had a Fourth Amendment privacy interest in the Kia. (See Suppl. Opp'n at 1.)

5

(quotation marks and citations omitted) (alterations adopted). "This standard does not demand certainty but only a fair probability that contraband or evidence of a crime will be found." Id. at 45 (quotation marks and citations omitted). Further, "experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." Id. (citations omitted). This analysis "is limited to facts known by the . . . officer at the time." Cordero v. City of New York, 282 F. Supp. 3d 549, 561-62 (E.D.N.Y. 2017) (quoting Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006)) (quotation marks omitted).

The Government argues that the officers had probable cause to believe that there was marijuana inside the car. Specifically, the Government emphasizes that the officers "observed Unidentified Man [ ] speaking to the defendant through the open window of the Kia, reach into the car to touch hands with the defendant, and walk away with a closed fist." (Opp'n at 18.) According to the Government, such behavior is "consistent with a hand-to-hand narcotics sale." (Id.) However, such behavior does not, in itself, establish probable cause. See Burgess v. City of New York, 15-CV-5525 (RRM), 2018 WL 1581971, at *4 (E.D.N.Y. Mar. 29, 2018) (denying summary judgment on a false arrest claim under 42 U.S.C. § 1983 because there was a dispute as to whether the officers had actually observed any exchange between the plaintiff and a suspected buyer later found to have drugs); Mohr v. City of New York, No. 12-CV-163 (LGS), 2013 WL 5988948, at *5 (S.D.N.Y. Nov. 12, 2013) (denying summary judgment on a false arrest claim under § 1983 because there was no probable cause to arrest the plaintiff where "the evidence in the record indicate[d] only that the two men shook hands as a form of greeting, and not that an officer witnessed any item or cash pass between them"); Perez v. Duran, 962 F. Supp. 2d 533, 539-40 (S.D.N.Y. 2013) (same).[2]

---

[2] Courts in this circuit do regularly find probable cause where officers actually observed money or items that look like contraband exchanging hands. See, e.g., Smith v. City of New York, No. 04-CV-3286 (TPG), 2010 WL

6

The Government therefore relies on its allegation that Officer Ramos "smelled a strong odor of marijuana coming from the driver's side of the Kia." (Opp'n at 18.) As the Government states—and Defendant does not dispute—such a smell is itself sufficient to establish probable cause. (See id. at 19 (citing United States v. Evans, No. 12-CR-414 (RWS), 2012 WL 5871611, at *3 (S.D.N.Y. Nov. 20, 2012); United States v. James, No. 10-CR-1293 (RPP), 2011 WL 6306721, at *5 (S.D.N.Y. Dec. 16, 2011); United States v. Colon, No. 10-CR-498 (RPP), 2011 WL 569874, at *12 (S.D.N.Y. Feb. 8, 2011); United States v. Jenkins, 452 F.3d 207, 214 (2d Cir. 2006)). Defendant responds, however, that it is "deeply implausible" that Officer Ramos would have been able to smell the marijuana from outside of the Kia. (Mot. at 4.) He notes: "[t]he marijuana in question was concealed in 'individual packages,' which themselves were concealed 'inside of a backpack, which itself was 'on the floor of the backseat'—several feet away from the driver side window." (Id. (quoting Compl. ¶ 4).) Defendant continues that "[i]t is unclear how anyone could smell any odor from that double-bagged marijuana from so far away, let alone the 'strong' odor alleged." (Id.)

There may be a case where a police officer's statement is so facially implausible that a suppression hearing is warranted even without a sworn affidavit from the defendant directly contradicting its assertions. This, however, is not such a case. It is undisputed that there was

---

3397683, at *1, 8 (S.D.N.Y. Aug. 27, 2010) (granting defendants summary judgment on false arrest claim in § 1983 suit for damages where officer arrested plaintiff after observing an individual hand "money to plaintiff and in return plaintiff handed an object" to the individual); Hartzog v. Rabideau, No. 05-CV-554, 2010 WL 2010948, at *9 (W.D.N.Y. May 18, 2010) (finding probable cause where officer observed actions that "seemed to indicate that [the defendant] was handing something to the man in brown, and the man in brown was handing currency" to the defendant); United States v. Washington, No. 02-CR-1574 (LTS), 2003 WL 21250681, at *1 (S.D.N.Y. May 29, 2003) (denying a motion to suppress because probable cause to arrest existed where officer observed the defendant hand an item "smaller than a tea bag" to another individual in exchange for money); Sam v. Brown, No. 00-CV-4170 (JG), 2002 WL 31102644, at *3-4 (E.D.N.Y. Sept. 10, 2002) (finding probable cause where officer observed the defendant engage in what appeared to be the sale of drugs and where "the incriminating character of the green bags" was "immediately apparent"). However, the officers here did not actually see an exchange. (See Opp'n at 18.) Behavior that is merely consistent with an exchange between two people cannot, without more, give rise to probable cause that any exchange—much less an exchange of illegal contraband—occurred.

marijuana in the car (see Mot. at 2 (citing Compl. ¶ 6)), and the video recording of the interaction shows that the windows were rolled down when the officers approached the Kia (see SM000254 at 0:26-0:33). Moreover, whether the officers mentioned marijuana in the video, and when they did so,[3] does not indicate whether one or both of them smelled marijuana at the time. As the Government observes, there could be any number of reasons an officer might decline to mention that they smelled marijuana when engaging in a traffic stop. (See Opp'n at 20 (noting that "announcing that [the officer] believed there was marijuana . . . could have invited the possibility of a dangerous car chase, the defendant's escape or the destruction of evidence" and that making such an announcement "would have created the potential for danger for the officers and the community").)

Without some concrete evidence indicating that the court should doubt whether the officer smelled marijuana, a suppression hearing is inappropriate. Cf. Garcia, 2018 WL 3407707, at *4 ("Defendant does not provide any support [] for his assertion that police could not smell less than two grams of marijuana, and the Court does not find the argument persuasive. Nor is there an affidavit from someone with personal knowledge denying that the car smelled like marijuana. As a result, this issue is not sufficiently disputed."). Defendant's motion to suppress the marijuana and the firearm as fruits of an unreasonable search is therefore denied without prejudice. If Defendant submits a sworn affidavit or other evidence that is "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested

---

[3] One of the video recordings of the encounter does show one of the officers telling Defendant he's searching the Kia because he smelled "bud" (presumably referring to marijuana). (See SM000251 at 0:32-0:46.) However, he made this statement after Defendant was removed from the Kia, and the door to the Kia was already open. (Id.) Thus, while this statement may be relevant to indicating what the officer smelled outside of the vehicle, it was not made contemporaneously with the initiation of the search at issue and does not conclusively show that he smelled marijuana at that time.

issues of fact going to the validity of the search are in question," Barrios, 210 F.3d 355, at *1 (citation omitted), a suppression hearing may be warranted.

### B. The Inventory Search of the Kia

Second, Defendant claims that the inventory search of the Kia was unreasonable, and asks the court to suppress the firearm as a fruit of that unreasonable search. (See Mot. at 4-6.) Specifically, Defendant contends that the police officers exceeded the scope of a valid inventory search when they opened the fuse box inside the Kia (and discovered the firearm inside of it). (See id.)

"[W]hen law enforcement officials take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without . . . probable cause." United States v. Lopez, 547 F.3d 364, 369 (2d Cir. 2008). A valid inventory search is not done "to detect crime or to serve criminal prosecutions," but "for quite different reasons: (1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger." Id. Police officers may "open closed containers as part of an inventory search so long as they act in good faith pursuant to standardized criteria or established routine." United States v. Morillo, No. 08-CR-676 (NGG), 2009 WL 3254431, at *8 (E.D.N.Y. Oct. 9, 2009) (quoting United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002)). "The existence of such a valid procedure may be proven by reference to either written rules and regulations or testimony regarding standard practices." Id. (quoting Mendez, 316 F.3d at 137). Nonetheless, not "every detail of search procedure must be governed by a standardized policy." Lopez, 547 F.3d at 369.

Fruits of an inventory search conducted in "bad faith or solely for the purpose of investigation" will be suppressed. United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994)

(emphasis added). However, the fact that an officer has a "hope or motive" that an otherwise valid inventory search will uncover evidence does not invalidate that search. United States v. Banks, 150 F. Supp. 2d 548, 554 (S.D.N.Y. 2001); see also United States v. Williams, 15-CR-499 (SJ), 2016 WL 11447844, at *10 (E.D.N.Y. July 20, 2016) (holding that a hope of finding evidence during a search "does not invalidate an otherwise valid inventory search conducted pursuant to reasonable police procedures." (citations omitted)), report & recommendation adopted by, 2016 WL 4542352 (E.D.N.Y. Aug. 31, 2016); United States v. Mundy, 806 F. Supp. 373, 376-77 (E.D.N.Y. 1992) ("The validity of an inventory search is not vitiated by police suspicion that evidence of a crime may be found." (citations omitted)).

Here, the Government argues that the inventory search of the Kia was conducted in good faith pursuant to established procedures laid out into the NYPD Patrol Guide (the "Patrol Guide"). (Opp'n at 22-23.) It states that "[t]he Patrol Guide directs officers to 'search the interior of the vehicle thoroughly' including but not limited to the 'glove department,' 'under and behind the dashboard,' 'in the air vents where accessible,' 'under the hood,' and in the 'trunk.'" (Id. at 23 (alterations adopted).) According to the Government, "[a] fuse box that was designed to and did open easily by hand is clearly encompassed by this policy." (Id.)

Defendant disagrees. He analogizes searching the fuse box to officers removing a door panel to search behind it, which federal courts have regularly held exceeds the scope of a permissible inventory search. (Mot. at 5 (citing United States v. Best, 135 F.3d 1223, 1225 (8th Cir. 1998); United States v. Torbert, 207 F. Supp. 3d 808, 823-24 (S.D. Ohio 2016)).) He also points to New York state cases that have found that warrantless searches of interior car panels are not justified as inventory searches. (Id. (citing New York v. Gomez, 13 N.Y.3d 6, 11 (2009);

10

New York v. Lamb, 862 N.Y.S. 2d 810, 9 Misc.3d 1120(A) (Sup. Ct. Oct 20, 2005)).) As to the Patrol Guide, he argues:

> [T]he portion of the Patrol Guide [the Government] proffers . . . says that the search of the interior of the vehicle 'should include any area that may contain valuables,' and goes on to list places where valuables might be stored (like the glove compartment), put down briefly (like the area around the seats and ashtrays) or accidentally lost (like in the accessible air vents or under floor mats). . . . Nowhere does the chapter authorize the police to open fuse boxes, or any similar utility or door panels, for the simple reason that those are not areas that would contain valuables.

Id.

As to the fuse box at issue here, the court agrees with the Government that the officer's decision to search it was made pursuant to the strictures laid out in the Patrol Guide, and that the search was a permissible inventory search. The Patrol Guide states describes examples of areas to be searched; it does not proscribe an exhaustive list. (See NYPD Patrol Guide (Dkt. 23-4) at 1.) Nor does it need to do so to effectively guide officers' discretion in undertaking inventory searches. See Lopez, 547 F.3d at 369 (holding that not "every detail of search procedure must be governed by a standardized policy"). Moreover, the Patrol Guide does state that "[a]ny closed container may be opened and its contents inventoried" (see NYPD Patrol Guide at 2), and directs officers to "[f]orce open trunk, glove compartment, etc. only if it can be done with minimal damage" (id. at 1.) This language encompasses the search here, in which an officer opened a fuse box that, as the Government notes, "was designed to and did open easily by hand" (see Opp'n at 23; see also Reply at 3). Opening such a container is fundamentally different from forcing open door panels of a vehicle that were not designed to opened easily. Cf. Williams, 2016 WL 4542352, at *3-4 (holding that a police officer did not exceed the scope of a lawful inventory search when he removed a "plastic panel on the side of the front console" because it "snapped off with [his] fingertips, did not require tools," and did not require "much force" to

11

remove (quotation marks omitted)); United States v. Cruz, No. 10-CR-1730, 2011 WL 13289808, at *10-12 (D.N.M. Apr. 27, 2011) (finding that an inventory search of the area underneath a cupholder was valid because the police department had a policy of inventorying property found "inside closed compartments or locked containers within the vehicle" and "the cup holder in the [vehicle's] center console was loose and . . . it lifted up freely in [the officer's] hands, without force and without manipulation"); United States v. Wiggins, No. 09-CR-169, 2010 WL 2674034, at *4 (W.D. Mo. June 7, 2010) (finding that a search behind an instrument panel was a valid inventory search because the panel moved on contact and a "gentle pull" removed it completely, unlike the removal of a door panel, which would require "a forceful removal").

Further, an evidentiary hearing on this issue is not required because the parties do not disagree about the fundamental facts. Defendant does imply that the video recording of the search indicates that the officers acted with bad faith in searching the car, claiming that their behavior seems "performative." (Mot. at 6.) In particular, when the supervisors arrive on the scene, a supervisor gestures to his chest area, and the officer wearing the camera responds, "I'm still, yeah I'm still." (SM000253 at 13:42.) Another officer adds "yeah we didn't cut it off." (Id.) One of the supervisors then says "kill the cameras" (id. at 14:08), and the video recording ends shortly thereafter. However, such evidence is insufficient to raise a "contested issue" of material fact." See Harun, 232 F. Supp. 3d at 285 (citation omitted). This is because the officers' statements do not demonstrate that the search of the Kia in general—or the fuse box more specifically—was undertaken in "bad faith or solely for the purpose of investigation." See Thompson, 29 F.3d at 65. In fact, all the statements Defendant points to occur after the search had uncovered a firearm, and indicates very little about the officers' state of mind when

commencing the search or opening the fuse box. Further, what the video shows prior to the discovery of the firearm is fully consistent with a permissible inventory search: as Defendant notes, the officers appear to be "dutifully collecting and sorting through the car's inventory, and the officer who finds the gun makes a surprised exclamation when he finds the gun" (Mot. at 5-6). (See SM000253 at 00:00-10:18.)

Accordingly, Defendant's motion to suppress the marijuana and the firearm as fruits of an unreasonable search is denied without an evidentiary hearing.

## IV. CONCLUSION

For the foregoing reasons, Defendant's (Dkt. 22) motion to suppress the marijuana and the firearm is DENIED.

SO ORDERED.

Dated: Brooklyn, New York
May 10, 2019

S/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge