

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

THE UNITED STATES OF AMERICA,

       -against-

SHA KEN MILLER,

            Defendant.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**18-CR-395 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Defendant Sha Ken Miller moves to suppress evidence that was seized from a black Kia

Sportage (the "Kia"), arguing that police officers stopped and searched the Kia in violation of his

Fourth Amendment rights. (*See* Mot. to Suppress (Dkt. 22); Suppl. Letter in Supp. of Mot. (Dkt.

30).) After the court initially denied the motion without prejudice and without an evidentiary

hearing (*see* Mem. & Order ("M&O") (Dkt. 32)), Mr. Miller submitted additional evidence and a

renewed request for an evidentiary hearing (*see* Renewed Mot. for Hg. (Dkt. 33)). Based on Mr.

Miller's additional submissions, the court granted his request for an evidentiary hearing (*see* July

9, 2019 Order), which was held on October 11, 2019. Thereafter, the parties submitted

supplemental briefing. (*See* Def. Post-Hg. Mem. in Supp. ("Mem.") (Dkt. 52); Gov't Post-Hg.

Mem. in Opp. ("Opp.") (Dkt. 53); Def. Reply in Further Supp. ("Reply") (Dkt. 54).)

The court has reviewed the parties' supplemental filings and considered the testimony

offered at the suppression hearing. While the court acknowledges that the question presented is a

close one, the court agrees with Mr. Miller that the Government has not carried its burden to

establish that the officers' initial stop of the Kia was supported by reasonable suspicion.

Specifically, the court holds that the Government has failed to establish by a preponderance of

the evidence that the arresting officers observed a traffic violation—*i.e.*, that they observed the

1

Kia idling for more than three minutes—before executing a stop. The court further holds that the officers' testimony that they observed a hand-to-hand drug transaction does not independently establish reasonable suspicion to justify stopping Mr. Miller.

Accordingly, Mr. Miller's motion to suppress is GRANTED.

## I.     FACTUAL BACKGROUND

The court briefly summarizes the facts that are undisputed for the purposes of this motion before summarizing the relevant testimony of each witness on the dispositive factual issues. The court evaluates that testimony and sets forth its legal conclusions in the discussion section that follows. *See infra* Section III.

### 1.     Undisputed Facts

On July 11, 2018, New York City Police ("NYPD") Officers Peter Ramos and Matthew Lambert were patrolling the area around the Walt Whitman Houses (the "Whitman Houses") in Fort Greene, Brooklyn. Both officers are members of NYPD's anticrime unit which, as Officer Lambert testified, conducts "pro-active policing," with plainclothes officers conducting active patrols to "stay on top of recidivists . . . and crime patterns" in their precincts in lieu of, for example, responding to radio calls. (Tr. of Supp. Hg. ("Tr.") at 84.) The officers were patrolling the area in an unmarked Ford Fusion when they encountered Mr. Miller, who was standing in front of the Kia, which was parked near 80 Monument Walk (one of the buildings comprising the Whitman Houses). (*Id.* at 14-15, 86.) The officers recognized Mr. Miller from an Investigation Card ("I-Card") they had viewed earlier that morning, according to which Mr. Miller was a suspect in a shooting reportedly involving a black SUV that was being investigated by another precinct. (*Id.* at 15-16.) After Officer Lambert verified that the I-Card remained active, the officers decided to make a loop around the Whitman Houses in order to drive by Mr. Miller

again. (*Id.* at 17-18, 41, 90-91.) To begin this loop, the officers turned onto a pedestrian walkway and assumed at that point that Mr. Miller had realized they were police officers, as only police and emergency vehicles are permitted to drive on the walkway. (*Id.* at 17-18, 91.) The completed loop took "a minute or two." (*Id.* at 92.)

On their second pass (after having completed the first loop around the Whitman Houses), the officers observed Mr. Miller seated in the driver's seat of the Kia and an unidentified man leaning through the open passenger-side window. (*Id.* at 18-19.) Mr. Miller and the unidentified man touched hands, after which the unidentified man walked away. (*Id.* at 42-43, 92.) Although both officers conceded that they saw neither narcotics nor currency exchange hands, Officer Lambert testified that he "just had a feeling [they had witnessed] a hand-to-hand [drug sale]." (*Id.* at 21; *see also id.* at 92-93.) Based on that feeling, the officers decided to make a second loop around the Whitman Houses (and third pass by the Kia) to further investigate, this time opting to take a different route. (*Id.* at 21-22, 94.) On both the first and second passes, the officers drove on the opposite side of the parking lot, one to two car lengths away from the Kia, although Officer Ramos testified that the pedestrian walkway on which they drove while making their first loop was "directly right in front of the [Kia]." (*Id.* at 17; *see also id.* at 21.)

Upon making their third loop, the officers, now driving on a sidewalk, observed the same unidentified man sitting on a bench and sprinkling something into a rolling paper. (*Id.* at 22, 94-95.) Both officers testified that, upon seeing the officers, the unidentified man got up and walked inside 88 Monument Walk (which is connected to 80 Monument Walk) while Mr. Miller remained in the Kia. (*Id.* at 23, 45, 95.) On this third pass, the officers approached the Kia from behind and passed alongside it. (*Id.* at 23-24, 50-51.)

3

At this point, the officers decided to stop Mr. Miller. (*Id.* at 24-25.) Officer Ramos called NYPD Sergeant Jack Wu to advise him that he and Officer Lambert intended to stop Mr. Miller both because Mr. Miller's car was idling and because of the purported hand-to-hand transaction they had witnessed. (*Id.* at 24, 54-55.) The officers made one final loop around the Whitman Houses and pulled up behind the Kia; Sgt. Wu arrived in a separate vehicle, which he parked in front of the Kia, blocking it in. (*Id.* at 25; *see also* Lambert Body Cam Footage (Gov't Ex. 6).) The officers executed the stop "[a]bout ten minutes or just a little over" after first seeing Mr. Miller standing outside the Kia. (Tr. at 25.)

When the officers pulled up behind the Kia, Isavior Coombs, a friend of Mr. Miller, was standing with his head in the open passenger-side window, speaking with Mr. Miller, who was still in the driver's seat. (Tr. at 99-100, 121-122.) Mr. Coombs left the scene shortly after the stop began, having been asked to do so by either Officer Lambert or Sgt. Wu (the record is unclear). (*Id.* at 97-98.) Both officers got out of their patrol car and approached the Kia, Officer Ramos toward the driver side and Officer Lambert toward the passenger side. (*Id.* at 25, 97.) Officer Ramos testified that he detected a strong odor of marijuana emanating from the Kia as he approached the Kia's open driver-side window. (*Id.* at 25-26.) Officer Ramos accordingly ordered Mr. Miller to get out of the Kia so that he could search it. (*Id.*; *see also* Ramos Body Cam Footage (Gov't Ex. 3).) Upon entering the vehicle, Officer Ramos noticed burnt cigarette wrappers in the Kia's cupholder, which he testified smelled of burnt marijuana. (Tr. at 31; *see also* Ramos Body Cam Footage.) Officer Ramos then searched the Kia and discovered marijuana sealed inside various containers in a backpack on the floor of the Kia's backseat. (Tr. at 30.) Meanwhile, Officer Lambert stood with Mr. Miller and commented to Mr. Miller that he could not leave his car running. (*Id.* at 112; Lambert Body Cam Footage.)

After transporting the vehicle back to the station, Officer Ramos conducted an inventory search of the Kia. (Compl. (Dkt. 1) ¶ 6.) During the inventory search, Officer Ramos discovered a .25 caliber Beretta semiautomatic pistol concealed inside the fuse box beneath the steering wheel. (*Id.*; *see also* Tr. at 33; Photograph (Gov't Ex. 4).)

### 2.    Testimony Regarding Dispositive Issues

The court summarizes below the testimony offered regarding the issues dispositive to this motion, and specifically testimony concerning: (1) whether the Kia was idling, and (2) the officers' observations of the alleged hand-to-hand narcotics sale.[1]

#### a.    *Whether the Kia was Idling*

Officer Ramos initially testified that his and Officer Lambert's justification for stopping the Kia was that it had been idling for over three minutes in violation of Title 24, Section 24-163 of the New York City Administrative Code. (*See, e.g.*, Tr. at 24 ("[Officer Ramos:] At that point, we contacted our supervisor and told him his car is idling, we felt we had enough probable cause to conduct a stop."); *see also* Mem. in Opp. to Mot. (Dkt. 23) at 16-17.) On direct examination, Officer Ramos testified that the Kia was idling on each of the three passes he made with Officer Lambert, as well as at the time that they initiated the stop. (Tr. at 15, 19, 24-25.) Officer Lambert testified on direct examination that the Kia was idling during the first two passes but did not

---

[1] The court notes that the issue of whether the officers, in fact, detected the odor of marijuana emanating from the Kia was the only disputed factual issue raised by Defendant's initial and renewed motion papers and, indeed, the court ordered the evidentiary hearing in order to resolve that dispute. As such, the parties devote a considerable proportion of their briefing to debating whether the testimony on this point was credible. Because, however, after having observed and considered the officers' testimony, the court holds that the initial stop ran afoul of the Fourth Amendment for entirely unrelated reasons, whether the officers did smell marijuana or not is ultimately immaterial to the disposition of this motion. Notwithstanding, though the court is sympathetic to Mr. Miller's argument that a "strong odor of marijuana" is deployed far too frequently as a rationale to justify a search—often in cases in which it strains credulity—the amount of marijuana recovered from the Kia coupled with the fact that both fresh and burnt marijuana were present in the vehicle leads the court to conclude that this is not such a case. As such, were a resolution of this issue required to dispose of this motion, the court would resolve it in the Government's favor.

provide any testimony concerning whether it was idling during the third pass (though he testified on cross-examination that it was running during the third pass as well). (*Id.* at 91-92, 112.) Neither officer testified on direct examination as to how he knew that the Kia was idling when driving past it.

When asked by Mr. Miller's counsel as to how he was able to tell that the Kia's engine was running, Officer Ramos was initially not forthcoming. Officer Ramos acknowledged that he passed the car from the front (and thus could not see the tailpipe) on both of the first two passes and admitted that he had not looked for the tailpipe during the third pass, when he approached the car from behind. (*Id.* at 51.) Officer Ramos further admitted that he could not recall whether the windows of his patrol vehicle were up or down when he and Officer Lambert drove past the Kia. (*Id.* at 51) When pressed as to how, then, Officer Ramos was able to tell that the Kia was running, he offered the following testimony:

> Q: Okay, from what you can remember, you believed that Mr. Miller's Kia was – engine was running; correct?
> **A: Yes.**
> Q: And that's based on the fact that he was in the car at certain times?
> **A: We just knew it was running.**
> Q: Okay, I'm interested in how you knew it was running.
> **A: We just knew; we could hear the engine running, passing through it.**
> Q: You could hear the engine running?
> **A: We could tell it was on.**
> Q: When you say you could hear the engine running, you don't actually remember if the windows of your patrol car were up or down; correct?
> **A: I don't remember.**
> Q: If could have been up, right?
> **A: It could have been up.**

(Tr. at 52 (emphasis added for clarity).)

Officer Lambert did not testify as to whether the windows were up or down when he and Officer Ramos drove past the Kia. He did, however, testify that he was able to hear the Kia's

engine running during all three passes from his position in the patrol car. (*Id.* at 112-113.)

Further, while Officer Ramos testified on direct examination that he told Sgt. Wu that he and

Officer Lambert intended to stop the Kia because it had been idling for over 3 minutes (*id.* at 24),

Sgt. Wu, whom the defense called, did not mention the alleged idling at all during his testimony

and instead testified that he came to the scene because Officer Ramos told him that he and

Officer Lambert had witnessed a possible hand-to-hand narcotics transaction (*id.* at 139, 143).

Meanwhile, defense witness Isavior Coombs testified on cross-examination that he did not recall

whether the engine was running during his conversation with Mr. Miller when the officers

approached. (*Id.* at 128.)

b.    *The Alleged Hand-to-Hand Transaction*

In addition to the alleged idling, Officers Ramos and Lambert also testified that they

initiated the stop in part because they witnessed what they believed was a hand-to-hand sale of

narcotics. Although Officer Ramos testified on direct examination that he called Sgt. Wu and

advised him that he and Officer Lambert intended to stop the Kia because it was idling (*id.* at

24), he later expanded this testimony on cross-examination, during which he testified that he also

advised Sgt. Wu of the hand-to-hand transaction as part of the reason for initiating the stop (*id.* at

54.) As discussed in the preceding section, Sgt. Wu testified that he arrived on the scene because

he was alerted to the possible hand-to-hand transaction and did not refer to the alleged idling. (*Id.*

at 139, 143.)

As to the transaction itself, both officers testified on direct examination that they saw Mr.

Miller (who was seated in the Kia) and an unknown individual (who was standing outside the

passenger-side window) "touch hands." (*Id.* at 19-21, 92-93.) Both officers further testified that

they witnessed Mr. Miller give the unidentified man what they believed to be some sort of signal,

after which the man looked back at the officers and walked away from the car. Specifically, Officer Ramos testified that he believed Mr. Miller had given the unidentified man "like a head nod, like he lifted his head up" (*id.* at 20), while Officer Lambert testified that "it looked like Sha Ken Miller said something to" the unidentified man (*id.* at 92).

Both officers admitted on direct examination that they had seen neither narcotics nor currency exchange hands. (*Id.* at 19-20, 93.) Nonetheless, both officers testified that they believed they had witnessed a hand-to-hand narcotics sale. Officer Lambert based his conclusion on "[b]asically the body language and the demeanor, also the reaction of the unidentified man to seeing me," which he noted was informed by his training as a police officer. (*Id.* at 93.) Officer Ramos testified that, based on his training, while "[w]e didn't see any exchange of narcotic[s] . . . we just had a feeling a hand-to-hand had t[aken] place." (*Id.* at 21; *see also id.* at 20-21.) Neither officer testified that they witnessed the unidentified man, for example, put something into his pocket or walk away from the Kia with a clenched fist.

Both officers testified that they made the third pass around the Whitman Houses in order to continue their investigation, or, as Officer Lambert put it, "to confirm that [the unidentified man] had just bought weed from the car." (*Id.* at 94; *see also id.* at 21-22.)[2] The officers testified that, as they approached the Whitman Houses for the third time, they witnessed the unidentified man whom they had seen touch hands with Mr. Miller sitting on a bench sprinkling something onto a rolling paper before abruptly getting up and walking into 88 Monument Walk upon noticing the officers.

---

[2] The court notes that Officer Lambert's testimony is not consistent with what the officers would have known at the time; insofar as they both conceded that they did not witness anything exchanging hands, even assuming that a hand-to-hand transaction had taken place, there is no basis in either officers' testimony on which they could have fairly concluded that the man had purchased marijuana as opposed to any other drug.

Officer Ramos testified on direct examination that he observed the man sprinkling "what appeared to be marijuana" onto a cigarette wrapper, but did not offer any factual basis for his conclusion that the substance "appeared to be" marijuana. (*Id.* at 22.) Officer Ramos conceded on cross-examination that he had inferred that the substance was marijuana based on the unidentified man's behavior and the fact that he had previously observed him touching hands with Mr. Miller. (*Id.* at 44-45.) Officer Lambert likewise testified on direct examination that when he observed the unidentified man "it appeared that he was rolling marijuana" but, like Officer Ramos, he did not elaborate on the basis of his conclusion. (*Id.* at 94-95.) On cross-examination, Officer Lambert clarified that "[he] didn't see exactly what [the man] was sprinkling, but [he] saw that [the man] had something brown in his hands," and stated that "[he] was also basing [his] belief that [the man] was rolling marijuana based on how he was doing it . . . It was the way he was sitting and where his hands were in front of him." (*Id.* at 111.) Notwithstanding, Officer Lambert admitted that he did not know whether the substance in question was marijuana or tobacco. (*Id.*) Finally, both officers testified that although the unidentified man got up and walked inside 88 Monument Walk upon noticing the officers (*id.* at 23, 95), neither officer testified that Mr. Miller—who the officers believed had recognized them as police officers—got up or drove away at any point.

## II.  LEGAL STANDARD

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. Const. amend. IV. Generally, evidence that is seized pursuant to an unreasonable search or derived from such a search must be suppressed. *James v. Illinois*, 493 U.S. 307, 311-12 (1990). "[S]earches and seizures conducted without a warrant are presumptively unreasonable"; however, "several exceptions to the warrant requirement have been fashioned when

circumstances demand an immediate police response." *United States v. McCargo*, 464 F.3d 192, 196 (2d Cir. 2006) (internal citations omitted).

The Fourth Amendment permits police officers to conduct a "brief investigatory detention"—also known as a *Terry* stop—where the officer has reasonable suspicion that the person to be detained is either committing or has committed a crime. *See, e.g., United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). An officer is likewise permitted to initiate a traffic stop when she has reasonable suspicion that a traffic violation has occurred. *See United States v. Stewart*, 551 F.3d 187, 190-91 (2d Cir. 2009). A pretextual traffic stop—*i.e.*, one initiated in order to obtain evidence of a more serious crime—presents no constitutional issue, so long as the stop itself is supported by reasonable suspicion. *See United States v. Mota*, 155 F. Supp. 3d 461, 473 (S.D.N.Y. 2016) (citing *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d Cir. 1999)).

To support a *Terry* stop, such reasonable suspicion must comprise more than an "inchoate suspicion or mere hunch." *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (citation omitted). Reasonable suspicion instead requires "specific and articulable facts which, taken together with rational inferences from those facts, provide detaining police officers with a particularized and objective basis for suspecting legal wrongdoing." *Id.* (citation omitted). Whether a given set of facts gives rise to reasonable suspicion is assessed objectively in light of the totality of the circumstances as evaluated from the perspective of a reasonable police officer with the attendant training and experience. *Id.*

## III. DISCUSSION

Mr. Miller seeks to suppress the marijuana and firearm recovered from the Kia on the basis that the initial stop of the Kia was not supported by reasonable suspicion. (Mem. at 1, 6.)

Mr. Miller argues that: (1) the officers' testimony is insufficient to give rise to reasonable suspicion that the Kia was idling for more than three minutes, and (2) the officers' observations concerning the hand-to-hand transaction are likewise too vague to give rise to reasonable suspicion that they had witnessed a drug sale. (*Id.*) In response, the Government contends that: (1) the fact that the Kia was idling is not in dispute and, in any case, supported by the testimony; and (2) the testimony concerning the hand-to-hand transaction is persuasive and supplies an independent basis to affirm the stop. (Opp. at 6-9.) While both of these issues present close calls, for the reasons set forth below, the court concludes that Mr. Miller has the better of the argument as to each and, accordingly, grants his motion to suppress.

## A. The Kia

As an initial matter, the court rejects the Government's contention that Mr. Miller's failure to raise the issue of the idling Kia in his initial moving papers precludes him from raising the issue in his post-hearing briefing. (*Id.* at 6.) The Government cites no precedential support for this proposition and, as Mr. Miller correctly argues, it is the Government's burden to prove by a preponderance of the evidence that there was a sufficient factual and legal basis to initiate the stop. (Reply at 1); *see also, e.g., United States v. Morris*, No. 07-cr-029 (NG)(JO), 2007 WL 4351427, at *5 (E.D.N.Y. Dec. 12, 2007).

Based on the testimony adduced at the hearing and the court's consideration of the parties' exhibits, the Government has failed to meet its burden. Although both officers ultimately did testify that they could hear the Kia running when they drove past it, they were less than candid on direct examination. While Officer Lambert forthrightly volunteered this information on cross-examination, Officer Ramos was initially evasive and declared simply that he and Officer Lambert "just knew" the Kia was running when they passed by it. (Tr. at 51-52.)

11

Moreover, although Officer Ramos paired his second declaration that he and Officer Lambert "just knew" the engine was running with a declaration that they "could hear the engine running," when asked to confirm that he, personally, could hear that the engine was running, he responded only by saying "we could tell it was on." (*Id.* at 52.)

Compounding this issue is the fact that neither Officer Ramos nor Officer Lambert elaborated on how they possibly could have heard the Kia's engine running while driving past it in their own vehicle, which was also running, presumably with its own attendant engine noise. The court notes in particular the lack of any testimony that the windows of the officers' vehicle were down, in which case it *might* be plausible (though perhaps not likely) that the officers would have been able to hear the Kia's engine. Likewise, the court is troubled by the lack of testimony supplying any other affirmative indicia of a running engine; indeed, Officer Ramos testified on cross-examination that while the Kia's tailpipe was visible to him on the third pass, he did not, for example, make whether there were exhaust fumes coming from it.

Further, though the parties dispute whether the Kia's engine is audible in the officers' body camera footage (*see* Mem. at 5; Opp. at 7-8; Reply at 2), the court does not accord this issue much weight. Even assuming that the noise that can be heard when the officers are standing next to the vehicle is, in fact, engine noise as opposed to ambient background noise—and it is not clear that this is the case—the fact that the officers were able to hear the Kia's engine running while standing directly next to it does not support an inference that they must have been able to hear it while driving past it in their own vehicle.

As Magistrate Judge Orenstein observed in *United States v. Morris*, in a situation such as this one, in which the officers were clearly motivated to investigate Mr. Miller, they "would have good reason to be meticulous in their observation and documentation of the facts supporting an

investigative traffic stop." 2007 WL 4351427, at *8. Nonetheless, as in *Morris*, "none of those

expectations were met by the officers' testimony in this case." *Id.* Because the factual basis for

the officers' assertion that they observed the Kia idling is, at best, implausible, the court declines

to credit their testimony. Moreover, as there was no other evidence adduced at the hearing to

support the traffic stop, the court concludes that the stop was, as a matter of law, unsupported by

reasonable suspicion and thus unlawful.

## B.     The Hand-to-Hand Transaction

The Government argues that, even assuming that the testimony concerning the idling

does not provide a basis for the stop, the officers' observation of what they characterize as a

hand-to-hand drug transaction is independently sufficient to warrant denial of the motion. (Opp.

at 8-11.)

In its initial opinion denying the instant motion without prejudice, this court held that the

officers' observation of Mr. Miller and an unidentified individual touching hands was, standing

alone, insufficient to give rise to probable cause to search the Kia. (*See* M&O at 6 (collecting

cases).) The question before the court now, however, is not whether this observation gives rise to

probable cause, but rather whether it supplies reasonable suspicion sufficient to justify a *Terry*

stop, a standard notably less demanding than probable cause. *See, e.g., United States v. Bailey*,

743 F.3d 322, 332 (2d Cir. 2014) ("Notably, [reasonable suspicion] is less than probable cause").

It is clearly established that "[a] police officer's observation of what he *reasonably*

*believes* to be a drug transaction in progress clearly supports a reasonable suspicion sufficient to

stop the suspect for further investigation." *Crenshaw v. City of Mt. Vernon*, 372 F. App'x 202,

207 (2d Cir. 2010) (summary order) (emphasis added). The Government, however, points to no

precedent for the proposition that an officer's observation of two individuals touching hands,

13

without more, is sufficient to provide such reasonable belief, nor is the court aware of any case in which reasonable suspicion has been found absent additional factors not present here. *Cf., e.g., United States v. Conley*, 342 F. Supp. 3d 247, 261 (D. Conn. 2018) (finding reasonable suspicion to believe that drug transaction had taken place where, after observing driver of vehicle make several maneuvers consistent with "counter surveillance measures," officers saw unidentified man reach into vehicle and then walk away without speaking to driver). Moreover, though their decisions are not binding on this court, New York courts, which frequently confront this issue, decline to find probable cause or reasonable suspicion on similar facts. *See People v. Dubois*, 953 N.Y.S.2d 552(table), 2012 WL 1939973, at *3 (Crim. Ct. N.Y. Cty. 2012) (collecting cases). And, in any event, insofar as it is clearly established that reasonable suspicion requires more than a "mere hunch," *Dancy*, 843 F.3d at 106, Officer Ramos's testimony that, at the point immediately following their observation of Mr. Miller and the unidentified man touching hands, he and Officer Lambert "just had a feeling a hand-to-hand [drug sale] had taken place" strongly counsels against finding reasonable suspicion on these facts. As such, the court concludes that, just as the officers' observation of Mr. Miller touching hands with another person with whom he was speaking was insufficient to give rise to probable cause, it is likewise insufficient to support reasonable suspicion.

The Government asks the court to consider both officers' testimony that, shortly after witnessing the alleged exchange, they observed the unidentified man rolling a substance into a cigarette wrapper, which the officers concluded was marijuana. Here as well, however, the Government points to no analogous caselaw to support its assertion that this fact should change the court's conclusion; indeed, the cases on which the Government relies involve facts considerably more indicative of drug transactions than an officer's mere observation of an

individual rolling a cigarette. (*See* Mem. at 10 (citing, *inter alia, Morales v. Grenier*, 381 F.3d 47, 47-48 (2d Cir. 2004) (undercover officer's observation of defendant touching hands with four separate individuals, one of whom left with glassine envelope in hand, supported probable cause to arrest)).)

Notwithstanding, the court does not hold today that an officer's observation of individuals touching hands in an area known for drug transactions followed by an observation of the apparent purchaser rolling a marijuana cigarette or otherwise consuming marijuana (or another controlled substance) does not, as a matter of law, provide reasonable suspicion sufficient to justify a *Terry* stop. In this case, however, the officers' testimony concerning their observation of the apparent purchaser rolling marijuana does not establish by a preponderance of the evidence that the officers did, in fact, witness the man rolling a marijuana cigarette. Both officers testified that they did not see what the alleged was rolling nor did they provide any objective factual basis for their conclusion that the substance he was rolling (on a bench in broad daylight and, if the officers' testimony is to be believed, immediately after being alerted that there were police officers in the area) was marijuana. Moreover, Officer Lambert testified only that he could see "something brown" in the man's hand (Tr. at 111); what, exactly, Officer Lambert was referring to was never elucidated, but the court notes that the marijuana recovered from Mr. Miller was green (*see* Gov't Ex. 4)—a color that neither officer claimed to have observed—and takes judicial notice of the fact that cigarette tobacco is typically brown. In other words, just as with the alleged transaction itself, the officers appear to have had no more than a "mere hunch" that they had observed the man rolling marijuana. *Dancy*, 843 F.3d at 106.

The court therefore concludes that, even were it to credit officers' testimony *in toto*, the facts they attested to are simply insufficient to support a finding of reasonable suspicion.

Accordingly, the court holds that the officers' stop of the Kia was impermissible under the Fourth Amendment.

## IV.   REMEDY

Where evidence is obtained in violation of the Fourth Amendment, the remedy is ordinarily suppression. *See, e.g., United States v. Valentine*, 591 F. Supp. 2d 238, 242 (E.D.N.Y. 2008) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). This extends not only to any evidence recovered as a direct result of the Fourth Amendment violation, but also to all evidence subsequently discovered as a result of the primary violation, commonly known as the "fruit of the poisonous tree." *See, e.g., United States v. Cacace*, 796 F.3d 176, 188 (2d Cir. 2015).

While there are exceptions to this rule, the Government does not argue that any applies here. Accordingly, the exclusionary rule mandates suppression of all evidence seized following the officers' initial stop of the Kia, *i.e.* the marijuana and the firearm recovered from the Kia.

## V.   CONCLUSION

For the foregoing reasons, Defendant's (Dkt. 52) Motion to Suppress the marijuana and the firearm is GRANTED.


SO ORDERED.

                                                          s/Nicholas G. Garaufis

                                                          _____
Dated: Brooklyn, New York                                 NICHOLAS G. GARAUFIS
       February 11, 2020                                   United States District Judge


16